911 F.2d 1283
 17 Fed.R.Serv.3d 771
 Todd GOOS, et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
Natural Heritage Foundation, Southwest Iowa Nature Trails
Project, Inc. and Rails to Trails Conservancy, Intervenor.
Page County Conservation Board, Intervenor.
Iowa Southern Railroad Company, Inc., Intervenor.
 No. 89-2142.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 12, 1990.
Decided Aug. 22, 1990.
 
 T. Scott Bannister, Des Moines, Iowa, for petitioners.
 Charles H. Montange, Washington, D.C., for respondents.
 Evelyn Kitay, Washington, D.C., for intervenors.
 Before BEAM, Circuit Judge, HEANEY, Senior Circuit Judge, and LARSON,* Senior District Judge.
 BEAM, Circuit Judge.
 
 
 1
 Todd Goos and twenty other landowners filed a petition for review of an Interstate Commerce Commission decision. In the decision, served on May 18, 1989, the I.C.C. reconsidered its grant of an exemption pursuant to 49 U.S.C. Sec. 10505 (1982) for a transaction involving a railroad line in Iowa. The holding, in which the I.C.C. characterized the landowners' challenge as one not to the exemption but to the issuance of a Notice of Interim Trail Use under the Rails to Trails Act, see 16 U.S.C. Secs. 1241-1251 (1988), rejected the environmental and constitutional challenges raised by the landowners to the Rails to Trails Act, and reaffirmed the grant of an exemption from the requirements imposed by 49 U.S.C. Sec. 10903 (1982 & Supp. V 1987). In their petition for review, Goos and the other landowners argue primarily that the I.C.C. failed to comply with the National Environmental Policy Act (NEPA), 42 U.S.C. Secs. 4321-4347 (1982), when it granted a Notice of Interim Trail Use pursuant to 16 U.S.C. Sec. 1247(d) without preparing an environmental assessment. We affirm.
 
 I. BACKGROUND
 
 2
 On May 6, 1988, Iowa Southern Railroad filed with the I.C.C. a petition for exemption from abandonment pursuant to 49 U.S.C. Sec. 10505. Iowa Southern sought to exempt itself from the prior approval requirements of 49 U.S.C. Sec. 10903 as it sought to cease its use of approximately sixty miles of rail line stretching almost continuously from Council Bluffs to Blanchard, Iowa. Iowa Southern also sought to abandon approximately three miles of side track in Pottawattamie, Mills, Fremont and Page counties in Iowa. An exemption from abandonment allows a railroad to discontinue rail service upon meeting certain statutory conditions found in section 10505, thereby avoiding the more rigorous I.C.C. review otherwise required by section 10903 in a regular abandonment proceeding. The petition was initially opposed by the Page County Conservation Board, jointly by the Page County Board of Supervisors and the Page County Engineer, and by the group of landowners headed by Todd Goos.
 
 
 3
 Incident to its request for an exemption, Iowa Southern noted that it was negotiating with the Iowa Natural Heritage Foundation, a non-profit land trust which seeks to preserve natural areas in Iowa, to sell or donate the right of way for interim trail use pursuant to 16 U.S.C. Sec. 1247(d). In essence, section 1247(d), part of the Rails to Trails Act, encourages the preservation of existing rail corridors for public use and for possible future rail use (often referred to as railbanking) by allowing a railroad that seeks to abandon a line to negotiate interim trail use with an interested third party willing to assume financial responsibility for the line.[1] Section 1247(d) in effect prevents a rail line from being abandoned and thus from reverting to property owners holding reversionary interests. Instead, section 1247(d) provides that interim use of the line, voluntarily negotiated between the rail company and an interested third party, "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." Once begun, so long as interim trail use continues, section 1247(d) ensures that the property will not revert.
 
 
 4
 The procedure established to carry out this statutory scheme is as follows. When a railroad has filed a petition for abandonment under 49 U.S.C. Sec. 10903, or a petition for an exemption under 49 U.S.C. Sec. 10505, an interested prospective interim trail user may file a petition with the I.C.C. indicating its willingness to acquire and assume financial responsibility for the right of way. 49 C.F.R. Sec. 1152.29(a)(2) (1989). If the railroad indicates a willingness to enter into an interim trail use agreement, the I.C.C. will issue either a Certificate of Interim Trail Use (CITU) in a regular abandonment proceeding, 49 C.F.R. Sec. 1152.29(c), or a Notice of Interim Trail Use (NITU) in an exempt abandonment proceeding. 49 C.F.R. Sec. 1152.29(d). An NITU or CITU gives the railroad and the prospective trail user 180 days in which to reach agreement. If an agreement is reached, then no abandonment can result until the trail user terminates trail use in an I.C.C. proceeding. Absent agreement within 180 days, the CITU or NITU converts into a notice of abandonment.
 
 
 5
 In this case, several county conservation boards and the Iowa Natural Heritage Foundation indicated their interest in trail use and filed statements of willingness to assume financial responsibility. In its decision of July 29, 1988, in which the I.C.C. issued the abandonment exemption under 49 U.S.C. Sec. 10505, the I.C.C. noted the availability of interim trail use, and made the exemption subject to a public use condition pursuant to 49 U.S.C. Sec. 10906 (1982). The public use condition precluded the railroad from disposing of structures on the right of way that could be suitable for trail use. By decision of August 18, 1988, the I.C.C. stayed the effective date of the exemption for sixty days, to allow the I.C.C. to complete an environmental assessment on the environmental effects of abandonment.[2] The stay was twice extended to allow completion of the environmental assessment, but on December 12, 1988, the stay was vacated and an NITU entered. In its December 12 decision, however, the I.C.C. stayed implementation of the NITU pending its reconsideration of the abandonment exemption.
 
 
 6
 The I.C.C. undertook its reconsideration pursuant to a petition filed on August 19, 1988, by Todd Goos and the other landowners.[3] In their petition, the landowners requested that the I.C.C. require Iowa Southern to submit an expanded environmental report on the environmental effects of interim trail use, and argued that the operation of section 1247(d) constituted an unconstitutional taking of their reversionary interests. In its decision of December 12, 1988, the I.C.C. characterized the landowners' environmental argument as follows: "Certain adjacent landowners ... contend[ ] that the National Environmental Policy Act (NEPA) requires the Commission to consider: (1) the environmental effects of the conversion of a railroad right-of-way to interim trail use under section 8(d) of the Trails Act." Decision and Notice of Interim Trail Use or Abandonment, I.C.C. Docket No. AB-298 at 2 (December 12, 1988).[4]
 
 
 7
 The I.C.C. made its final decision on May 18, 1989. The I.C.C. concluded that it is not required by NEPA to "analyze the environmental effects of possible interim trail use." Iowa S. R.R.--Exemption--Abandonment in Pottawattamie, Mills, Fremont and Page Counties, IA, 5 I.C.C.2d 496, 501 (1989). Rather, the I.C.C. contends that it must consider only the environmental consequences of the proposed abandonment, as it did in its environmental assessment in this case, and not the environmental effects of the conversion to trail use. Furthermore, the I.C.C. found no unconstitutional taking by operation of section 1247(d). Thus, the I.C.C. vacated the stay imposed on implementation of the NITU. Since then, Iowa Natural Heritage Foundation has reached agreement with Iowa Southern for interim trail use, and the parties advise us that work on the trail is currently underway.
 
 II. DISCUSSION
 
 8
 In their initial brief to this court, the landowners presented four issues for review. Three of them involved the constitutional takings question, and the fourth argued that the I.C.C. failed to comply with NEPA. Following the Supreme Court's decision in Preseault v. Interstate Commerce Comm'n, --- U.S. ----, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990), in which the Court considered and rejected similar takings claims arising out of section 1247(d), the landowners withdrew these arguments. Accordingly, the only issue we consider in this case is whether NEPA requires the I.C.C. to consider, as part of an abandonment proceeding, the environmental effects of conversion to interim trail use pursuant to section 1247(d).
 
 A. Proper parties
 
 9
 We begin, however, by considering whether we have jurisdiction over all of the petitioners in this lawsuit. As part of its initial brief, Iowa Southern moved to dismiss all petitioners except for Todd Goos for want of subject matter jurisdiction. Iowa Southern argues that the petition for review, which was timely filed on July 13, 1989, and which listed the petitioners as "Todd Goos, et al.," conveys jurisdiction in this court only over Goos because "et al." does not satisfy the specificity requirement of Fed.R.App.P. 15(a).
 
 
 10
 A party must appeal from a final order of a federal agency, in this case the I.C.C., within sixty days. 28 U.S.C. Sec. 2344 (1988). The I.C.C. entered its final decision on May 18, 1989, and petitioners "Todd Goos, et al." filed their petition for review on July 13, 1989, within the sixty-day period. Rule 15(a) requires, however, that "[t]he petition shall specify the parties seeking review." Fed.R.App.P. 3(c) similarly provides that "[t]he notice of appeal shall specify the party or parties taking the appeal." It is this specificity requirement with which "Todd Goos, et al." fails to comply, and, because the requirement is jurisdictional, as is the time limit within which to file a petition for review, we have jurisdiction only over Todd Goos.
 
 
 11
 In Torres v. Oakland Scavenger Co., 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), the Supreme Court considered the specificity requirement of Fed.R.App.P. 3(c). Petitioner Torres was one of sixteen plaintiffs intervening in an employment discrimination suit whose complaint was dismissed for failure to state a claim. On appeal from the dismissal, the notice of appeal and the order of the court of appeals omitted Torres's name due to a clerical error. On remand, the district court granted partial summary judgment against Torres because he did not appeal.
 
 
 12
 The Supreme Court held that Torres's notice of appeal "failed to comply with the specificity requirement of Rule 3(c)." Torres, 487 U.S. at 317, 108 S.Ct. at 2409. More specifically, the Court rejected the argument that Torres was included in the designation "et al." used in the notice of appeal.
 
 
 13
 The purpose of the specificity requirement of Rule 3(c) is to provide notice both to the opposition and to the court of the identity of the appellant or appellants. The use of the phrase "et al.," which literally means "and others" utterly fails to provide such notice to either intended recipient. Permitting such vague designation would leave the appellee and the court unable to determine with certitude whether a losing party not named in the notice of appeal should be bound by an adverse judgment or held liable for costs or sanctions. The specificity requirement of Rule 3(c) is met only by some designation that gives fair notice of the specific individual or entity seeking to appeal.
 
 
 14
 Id. at 318, 108 S.Ct. at 2409. We see no basis on which to distinguish Rule 3(c) from the specificity requirement of almost identical language found in Rule 15(a). Thus, we conclude that the use of "et al." in this case failed to designate any of the other landowners.
 
 
 15
 The other landowners argue, however, that their names were individually included in two other pleadings, a motion to amend the petition for review filed on August 10, 1989, and their appearance, filed July 31, 1989. The Supreme Court held in Torres, however, that both the specificity requirement and the time limit provided for appeal in Rule 4 are jurisdictional. Id. at 314-15, 108 S.Ct. at 2407-08. Similarly, we have held that the timeliness of a petition for review of an I.C.C. final order under 28 U.S.C. Sec. 2344 is a jurisdictional requirement that cannot be waived or modified. Cosby v. Burlington N. Inc., 793 F.2d 210, 212 (8th Cir.1986). Compliance with the specificity requirement of Rule 15(a) must therefore happen within sixty days of the I.C.C.'s final order. While petitioners filed a motion to amend and therein named individually twenty-one persons, the Supreme Court indicated in Torres that "leave to amend the notice of appeal" must be sought "within the time limits set by Rule 4." Torres, 487 U.S. at 317, 108 S.Ct. at 2409. The motion to amend in this case was not filed until August 10, well after the sixty-day period had run.
 
 
 16
 Finally, Goos contends that the appearance filed July 31, 1989, constitutes compliance with the specificity requirement of Rule 15(a). We agree with the Third Circuit that this argument is inconsistent with the Supreme Court's strict interpretation of the specificity requirement, and similarly note that the appearance, like the motion to amend, was not filed within the sixty-day jurisdictional period. See Cruz v. Melendez, 902 F.2d 232, 236 (3d Cir.1990). Accordingly, we have jurisdiction over only Todd Goos.
 
 
 17
 Iowa Southern further contends that Goos lacks standing to challenge the I.C.C.'s decision that NEPA does not apply to its consideration of a conversion under section 1247(d). Neither the I.C.C. nor Iowa Southern challenged Goos's standing below. Rather, Iowa Southern first raised this argument in its initial brief to this court, arguing that Goos does not own real property adjacent to or abutting the right of way, and that such ownership is necessary to give Goos standing to make either the constitutional or environmental arguments. Because standing is necessary before we have jurisdiction, we must consider this argument even though it was raised for the first time on appeal. Bender v. Williamsport Area School Dist., 475 U.S. 534, 541-42, 546-47, 106 S.Ct. 1326, 1331-32, 1333-34, 89 L.Ed.2d 501 (1986); Robinson v. Knebel, 550 F.2d 422, 424 (8th Cir.1977).
 
 
 18
 The pleadings before the I.C.C. contained assertions by Goos that he held "title to parcels of real estate located adjacent to and adjoining the subject right of way of the Railroad." Protest to Petition for Notice of Exemption, I.C.C. Docket No. AB-298 at 2 (July 1, 1988). Likewise, in his petition for reconsideration, Goos asserted that "[e]ach of the Landowners own and hold [sic] title to real estate which is located adjacent to or is bisected by the railroad right-of-way presently occupied by Iowa Southern Railroad Company." Petition for Reconsideration, I.C.C. Docket No. AB-298 at 2 (August 19, 1988). Iowa Southern, however, suggested to this court that its preliminary investigation revealed that Goos may not own property abutting the right of way. After a record title search in Pottawattamie and Mills counties, Iowa Southern submitted to us two affidavits from appropriate officials in each county indicating that Goos does not own property abutting the right of way. Hence, Iowa Southern argues that Goos cannot show a distinct injury to himself caused by the conversion, and moved to dismiss for lack of standing.
 
 
 19
 Article III of the United States Constitution "limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.' " Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). The Supreme Court has held that, at a minimum, article III
 
 
 20
 requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 [99 S.Ct. 1601, 1608, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976).
 
 
 21
 Id. at 472, 102 S.Ct. at 758. Iowa Southern does not seriously argue that the causation requirements are not satisfied. Rather, Iowa Southern suggests that Goos cannot show injury in fact.
 
 
 22
 Injury in fact "requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." Sierra Club v. Morton, 405 U.S. 727, 734-35, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972). Again, Iowa Southern does not contend that Goos cannot show an injury of a character sufficient to satisfy the Constitution. Goos fears injury due to environmental problems threatened by the proposed conversion: clearing the roadbed of brush, trees and other vegetation; application of herbicides with their potential to drift onto neighboring farmland; the fire hazard posed by users of the trail; and the simple intrusion of trail users into an area not otherwise frequented by large numbers of people. Petition for Reconsideration at 3-4. Goos can clearly show a threatened, constitutionally cognizable injury, for injury in fact is not confined to those who can show an economic injury, but includes as well injury to aesthetic and environmental well-being. See United States v. SCRAP, 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973). Iowa Southern does not argue otherwise.
 
 
 23
 Rather, Iowa Southern contends that Goos cannot show an injury to himself. Goos must allege "a personal stake in the outcome" that is different from a generalized grievance shared by large numbers of the public. Warth v. Seldin, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 2204-05, 45 L.Ed.2d 343 (1975). In short, the injury in fact requirement ensures that the Court does not adjudicate " 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." Valley Forge, 454 U.S. at 475, 102 S.Ct. at 760. Based on affidavits submitted to us, we conclude that Goos has a sufficient personal stake in the outcome to meet the injury in fact requirement.
 
 
 24
 Following Iowa Southern's motion to dismiss, Goos submitted an affidavit in which he states that, while a resident and landowner in Pottawattamie County, he farms property located in Mills County which abuts the right of way. This farmland abutting the right of way is recorded in the name of Goos's father, C. Clint Goos. Todd Goos apparently farms the land under a partnership agreement with his father, in which both have a fifty percent interest. Although the property has not been deeded to the partnership, the partnership agreement recites that it has been "furnished" to the partnership. Goos states that he farms the land and is responsible for all actions taken in regard to it. Thus, he alleges "a direct, substantial and personal stake in whether the Iowa Southern Railroad right-of-way reverts to the adjacent farmers and landowners or whether it is permitted to be converted to a recreational trail." Affidavit of February 28, 1990, at 3. We agree.
 
 
 25
 Any environmental injuries which may result from the conversion will directly affect Goos. Given that we have held in several cases that persons who own property in, or merely reside near, an area threatened by environmental injury have an interest sufficient to support standing, Goos clearly has a sufficient personal stake.[5] See, e.g., National Wildlife Fed'n v. Agric. Stabilization & Conservation Serv., 901 F.2d 673, 677 (8th Cir.1990) (landowners living in drainage district had standing to assert environmental injuries caused by threatened loss of wetlands); Defenders of Wildlife v. Hodel, 851 F.2d 1035, 1040 (8th Cir.1988) (members of plaintiff organization who travel to areas in which endangered species threatened by contested projects had standing); Coalition for the Env't v. Volpe, 504 F.2d 156, 167 (8th Cir.1974) (persons living in vicinity of proposed development had standing to assert environmental injuries such as loss of open space and increased traffic, congestion and air pollution). The environmental injury threatened in this case affects Goos far more directly than the threatened injuries affected plaintiffs in these cases. Accordingly, we address the merits of Goos's NEPA challenge.
 
 B. Standard of Review
 
 26
 Goos suggests that the proper standard of review in this case is taken from Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), in which the Supreme Court held that NEPA requires that agencies take a "hard look" at the environmental consequences of their actions. Thus, even when de novo review is inappropriate, a reviewing court should engage in a "substantial inquiry" under the Administrative Procedures Act. Id. at 415, 91 S.Ct. at 823. See also Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989) (NEPA requires that agencies take "hard look" at environmental consequences of their actions); Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976) (role for reviewing court is to ensure that agency takes a "hard look" at environmental consequences, but not to substitute its own judgment for that of the agency). Goos argues that the this circuit has applied this "substantial inquiry" standard in a line of cases, and that they apply here. While we agree that NEPA requires that federal agencies consider carefully the environmental consequences of their actions, we disagree that these cases supply the standard for a reviewing court in considering agency compliance with NEPA.
 
 
 27
 In Minnesota Pub. Interest Research Group v. Butz, 498 F.2d 1314 (8th Cir.1974), we considered whether the Forest Service erred in determining that its involvement in timber sales in the Boundary Waters Canoe Area in Minnesota did not require it to prepare an environmental impact statement (EIS). We held that "review of an agency's determination not to prepare an impact statement should be measured by its reasonableness in the circumstances, not as to whether it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. at 1320. More precisely, we considered whether the Forest Service's involvement in timber sales constituted major federal action within the meaning of NEPA. At issue, then, was a threshold determination of whether NEPA applied to a particular action--the same issue presented in this case.
 
 
 28
 In Winnebago Tribe v. Ray, 621 F.2d 269 (8th Cir.), cert. denied, 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980), we considered the propriety of a decision by the Army Corps of Engineers not to prepare an EIS on the environmental impact of a power line running across the Missouri River. The Corps did prepare an environmental assessment (EA) on the river crossing pursuant to its issuance of a necessary permit, but declined to prepare an EIS. We reviewed that determination for reasonableness under the circumstances, according to the standard established in Minnesota Pub. Interest. Similarly, in Olmsted Citizens for a Better Community v. United States, 793 F.2d 201 (8th Cir.1986), we held that an agency's determination not to prepare an EIS "will be upheld if the agency can support the reasonableness of its decision." Id. at 204 (citing Winnebago Tribe, 621 F.2d at 271; Minnesota Pub. Interest, 498 F.2d at 1320). And in Missouri Coalition for the Env't v. Corps of Eng'rs, 866 F.2d 1025 (8th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 76, 107 L.Ed.2d 42 (1989) we held, relying on these cases, that "[t]he standard under which we review an agency's decision that preparation of an EIS is not required by NEPA is well settled." Id. at 1032. If the challenging party can show that the project would have a substantial impact on the environment, then an agency's determination not to prepare an EIS is reviewed for reasonableness. Id.
 
 
 29
 In Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989), however, the Supreme Court held that an agency's decision not to prepare a supplemental EIS, or an EIS in the first instance, is controlled by the arbitrary and capricious standard of the Administrative Procedures Act. See 5 U.S.C. Sec. 706(2)(A) (1988). In Marsh, the Corps of Engineers refused to prepare a supplemental EIS on the construction of the Elk Creek Dam in Oregon. The first EIS was prepared in 1971, and a final EIS, prepared because of incomplete information in the first EIS, was released in 1980. Plaintiffs argued that the Corps was required to prepare a supplemental EIS because of new information obtained since 1980. The Supreme Court reviewed the Corps's decision under the arbitrary and capricious standard.
 
 
 30
 But Marsh does not control this case, for Marsh is factually distinguishable from some of our cases. That is, the Supreme Court in Marsh did not consider the threshold applicability of NEPA. Rather, the agency had assumed that NEPA applied and had already considered the environmental consequences of the proposed action. Hence, the question in Marsh involved a "classic example of a factual dispute the resolution of which implicates substantial agency expertise." Marsh, 109 S.Ct. at 1860. In Marsh, the agency's determination not to prepare a supplemental EIS was based on its expert review of new factual information, such that "resolution of this dispute involves primarily issues of fact." Id.
 
 
 31
 Thus, Marsh establishes that when an agency determines not to prepare an EIS based on its review of the environmental impact of a project, as when it has already prepared an EA and issues a finding of no significant impact, a reviewing court reviews that determination under the arbitrary and capricious standard. Our cases which have reviewed a similar question under the reasonableness standard are therefore incorrect.[6] For instance, in Missouri Coalition, the Corps of Engineers determined that an EIS was unnecessary after the Corps had prepared an EA and otherwise considered the environmental consequences of the project; no claim was made that NEPA was simply inapplicable. Missouri Coalition, 866 F.2d at 1032. Thus, Missouri Coalition is similar to Marsh--at issue is an agency's factual determination made under the assumption that NEPA applies--and Marsh provides the controlling standard of review for such a factual question.
 
 
 32
 In this case, however, we do not deal with a factual question made under the assumption that NEPA applies to a particular agency action. Rather, we deal with the threshold issue of NEPA applicability in the first instance. The I.C.C. in this case did not make a factual determination that it need not prepare an EIS as to the effects of a conversion under section 1247(d), after assuming the applicability of NEPA, after preparing an EA, and after determining that there was no significant impact. Rather, the I.C.C. did not prepare an EIS because it contends that NEPA simply does not apply to the conversion of rail use to trail use under section 1247(d). It argues that its issuance of an NITU in a conversion proceeding is not a "major federal action" subject to NEPA. To this extent, we consider a different question than that presented in Marsh.
 
 
 33
 At issue in Minnesota Pub. Interest and in Winnebago Tribe, however, was precisely the same question as here. In Minnesota Pub. Interest, we were "faced with the Forest Service's determination that there has been no major federal action. It is generally accepted that the involved federal agency has the responsibility of making the threshold determination as to the applicability of NEPA." Minnesota Pub. Interest, 498 F.2d at 1319. Because this threshold issue differs from the factual question presented in Marsh, we conclude that Marsh does not overrule the reasonableness standard as applied to legal questions of NEPA applicability which we followed in Minnesota Pub. Interest and Winnebago Tribe. Accordingly, we are bound by these cases, and review the I.C.C.'s decision that NEPA does not require it to consider the environmental impact of a conversion under section 1247(d) for reasonableness in the circumstances.
 
 C. NEPA and 16 U.S.C. Sec. 1247(d)
 
 34
 NEPA requires all federal agencies to consider the environmental consequences of "major Federal actions significantly affecting the quality of the human environment" by preparing an environmental assessment, and, in some cases, an environmental impact statement. 42 U.S.C. Sec. 4332(2)(c). NEPA thus focuses on activities of the federal government and does not require federal review of "the environmental consequences of private decisions or actions, or those of state or local governments." See Ellis & Smith, The Limits of Federal Environmental Responsibility & Control under the National Environmental Policy Act, 18 Envtl.L.Rep. 10055, 10056 (Feb.1988). Moreover, NEPA does not mandate particular results, but instead prescribes only a process to ensure that federal agencies consider the environmental consequences of particular actions. See Robertson, 109 S.Ct. at 1846. Its focus is to ensure "that the agency, in reaching its decision, will have available and will carefully consider detailed information concerning significant environmental impacts." Id. at 1845.
 
 
 35
 At issue is whether I.C.C. issuance of an NITU or CITU pursuant to section 1247(d) is a "major federal action" requiring the I.C.C. to prepare an environmental assessment on the environmental consequences of interim trail use. The I.C.C. argues that its approval of interim trail use under section 1247(d) is essentially separate from its approval of discontinuance of railroad operations under either 49 U.S.C. Sec. 10903 or Sec. 10505, that it has no discretion in the conversion proceeding to refuse to issue an NITU or CITU because of environmental consequences, and that its action is therefore not "major federal action." We agree.
 
 
 36
 Abandonments are governed by 49 U.S.C. Secs. 10903-10904, and allow a rail carrier to abandon existing line if the I.C.C. finds "that the present or future public convenience and necessity require or permit the abandonment or discontinuance." 49 U.S.C. Sec. 10903. In considering the present or future public convenience, the I.C.C. weighs the potential harm to affected shippers and communities against the burden of continued operation on the railroad and on interstate commerce. See Colorado v. United States, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878 (1926); Iowa Southern, 5 I.C.C.2d at 501 n. 13. Thus, when a rail carrier seeks to abandon an existing line, it files a notice of intent to abandon with the I.C.C., 49 C.F.R. Sec. 1152.20 (1989), and an application for a certificate of public convenience and necessity within thirty days thereafter. 49 C.F.R. Sec. 1152.22 (1989). The I.C.C. then makes a decision on investigation or abandonment within forty-five days of the application. 49 C.F.R. Sec. 1152.26(a) (1989). An abandonment normally results in reversion of the right of way to the landowners holding reversionary interests. See Preseault, 110 S.Ct. at 919-20.
 
 
 37
 Incidental to this proceeding, as earlier indicated, the rail carrier may negotiate with an interested third party to consummate an agreement for interim trail use. A prospective interim trail user must file a petition with the I.C.C. indicating its willingness to acquire the right of way and to assume financial responsibility therefor, and must do so within thirty days of the application for abandonment. 49 C.F.R. Sec. 1152.29. The railroad must then reply within ten days after the I.C.C. issues its notice of findings in the abandonment proceeding. 49 C.F.R. Sec. 1152.29(b)(5). When the parties agree to negotiate, the I.C.C., as previously noted, issues an NITU or CITU, allowing the railroad to discontinue service during the 180-day negotiating period. 49 C.F.R. Sec. 1152.29(c) and (d). As the I.C.C. states, however, its issuance of an NITU or CITU is not only incidental to the abandonment, but also is itself not a guarantee of eventual trail use. The NITU or CITU serves only "to provide an opportunity for the railroad and prospective trail users to negotiate an agreement; thus, when we issue a NITU or CITU there is only a possibility that a particular right-of-way actually will be used as a recreational trail." Iowa Southern, 5 I.C.C.2d at 502.
 
 
 38
 The I.C.C. views abandonment and conversion as separate proceedings, and argues that only abandonment is "major federal action" within NEPA. The I.C.C. concedes that NEPA applies to abandonment proceedings, and has prepared environmental assessments on the environmental consequences of abandonment since 1987. See 49 C.F.R. Sec. 1105.6(b) (1989). In these assessments, the I.C.C. considers the impact of diverting rail traffic and the disruptive consequences of removing track and associated structures. Iowa Southern, 5 I.C.C.2d at 501. The I.C.C. requires the railroad to submit an environmental report, 49 C.F.R. Sec. 1105.7(a), (c) (1989), from which the I.C.C. then prepares an EA. In this case, the I.C.C. issued an EA on October 20, 1988, concluding: "Based on the information gleaned from all sources to date, we agree with the railroad's conclusion that, as currently proposed, abandonment of the line of railroad described above will not significantly affect the quality of the human environment. Accordingly, the environmental impact statement process is unnecessary." Joint Appendix at 210. In its decision on Goos's petition for reconsideration, the I.C.C. specifically declined to consider the environmental consequences of conversion. Iowa Southern, 5 I.C.C.2d at 501-04.
 
 
 39
 This circuit has addressed the threshold applicability of NEPA before, most notably in Ringsred v. Duluth, 828 F.2d 1305 (8th Cir.1987), in which we considered whether NEPA applied to the City of Duluth's construction of a parking ramp as part of a federal project to which NEPA otherwise applied. In Ringsred, The Fond du Lac Band of Lake Superior Chippewa Indians and the City of Duluth formed an economic development commission to develop and operate a gaming facility in a former Sears building in Duluth. The tribe purchased the building, transferred it to the United States to be held in trust as part of the reservation, and then leased it to the development commission. As part of the agreement, the City of Duluth agreed to construct a parking ramp next to the building on city-owned, non-reservation land, and to lease it to the development commission. The Secretary of the Interior approved this lease and certain other contracts as required by law. Ringsred argued that the EA done on the gaming facility was insufficient because it did not consider the environmental impact of the proposed parking ramp.
 
 
 40
 This court concluded that the Secretary's involvement in approving the lease between the city and the development commission was "so incidental that the project does not constitute part of a major federal action." Ringsred, 828 F.2d at 1308. In essence, we found that the Secretary's involvement in the project was not federal action because the Secretary had no legal or factual control over the ramp. While we must consider both legal and factual control, whether an agency action or project is part of some other concededly major federal action depends largely on whether the agency exercises legal control over the allegedly non-federal action or project. Thus, we begin with legal control.
 
 
 41
 In deciding whether a federal agency exercises legal control, we must consider whether some federal action "is a legal condition precedent to accomplishment of an entire nonfederal project." Winnebago Tribe, 621 F.2d at 272. In Winnebago Tribe, we held that a project by the Nebraska Public Power District to construct a transmission line from Iowa into Nebraska did not become "major federal action" subject to NEPA merely because a federal permit was required for that part of the line which crossed the river. Although a permit was required, this court found no grant of legal control over the entire project such that NEPA required an environmental assessment of the entire project. Id. at 272. The permit for the river crossing did not constitute an action in which "a federal agency gives a legally necessary discretionary approval enabling another significantly to impact on the environment." NAACP v. Medical Center, Inc., 584 F.2d 619, 633 (3d Cir.1978). Thus, that the Secretary of Interior in Ringsred was required by law to approve a contract involving the parking ramp did not constitute a grant of legal control over the entire gaming project. Ringsred, 828 F.2d at 1308.
 
 
 42
 Similarly, we do not think that section 1247(d) permitting a conversion to trail use can be "construed as a grant of legal control over the entire project," i.e., the conversion and use of the right of way for non-railroad purposes. Winnebago Tribe, 621 F.2d at 272. This is largely so because of the lack of discretion accorded the I.C.C. in issuing an NITU or CITU. The rationale in Ringsred, Winnebago Tribe, and Medical Center depends heavily on the degree of discretion exercisable by the federal agency with respect to the allegedly non-federal action. Those cases establish that major federal action occurs when a federal agency "has discretion in its 'enabling' decision to consider environmental consequences and that decision forms the legal predicate for another party's impact on the environment." Medical Center, 584 F.2d at 633. In such a situation it is fair to say that "the agency has significantly contributed to environmental impact." Id. Because we agree with the I.C.C. that its role in a conversion proceeding is essentially a ministerial one in which the I.C.C. has no discretion to consider the environmental effects of conversion, we find no legal control, and thus no major federal action.
 
 
 43
 As indicated, in an abandonment proceeding the I.C.C. determines whether an abandonment is appropriate by weighing the potential harm to affected shippers and communities against the burden of continued operation of the railroad in interstate commerce.[7] By contrast, under section 1247(d), the I.C.C. must issue an NITU or CITU when a private party files a statement of willingness to assume financial responsibility and the railroad agrees to negotiate. The statute states that in such circumstances, "the Commission shall impose" terms and conditions of transfer, and "shall not permit abandonment." 16 U.S.C. Sec. 1247(d) (emphasis added). The I.C.C. interprets the section to give it no power to compel a conversion between unwilling parties, and, conversely, no discretion to refuse one if voluntarily negotiated. Once the parties reach agreement, the I.C.C. suggests that it cannot refuse to permit trail use. Iowa Southern, 5 I.C.C.2d at 504.
 
 
 44
 We lack any discretion to decide whether rail banking and use of the right-of-way as a trail is desirable for a particular line; Congress has made that determination.... In administering the statute, we need only be assured that the Trails Act has been properly invoked and that its requirements will be met.
 
 
 45
 Rail Abandonments--Use of Rights-of-Way as Trails--Supplemental Trails Act Procedures, 4 I.C.C.2d, 152, 156 (1987); Iowa Southern, 5 I.C.C.2d at 502-03. We agree that by the plain terms of the statute, the I.C.C. has little, if any, discretion to forestall a voluntary agreement to effect a conversion to trail use.[8]
 
 
 46
 The role of the I.C.C. in conversion proceedings, then, is essentially ministerial. As we held in South Dakota v. Andrus, 614 F.2d 1190, 1193 (8th Cir.), cert. denied, 449 U.S. 822, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980), "[m]inisterial acts ... have generally been held outside the ambit of NEPA's EIS requirement. Reasoning that the primary purpose of the impact statement is to aid agency decisionmaking, courts have indicated that nondiscretionary acts should be exempt from the requirement." Accord Minnesota v. Block, 660 F.2d 1240, 1259 (8th Cir.1981), cert. denied, 455 U.S. 1007, 102 S.Ct. 1645, 71 L.Ed.2d 876 (1982) ("Because the Secretary has no discretion to act, no purpose can be served by requiring him to prepare an EIS, which is designed to insure that decisionmakers fully consider the environmental impact of a contemplated action."); Sierra Club v. Hodel, 848 F.2d 1068, 1089 (10th Cir.1988) ("The EIS process is supposed to inform the decision-maker. This presupposes he has judgment to exercise. Cases finding 'federal' action emphasize authority to exercise discretion over the outcome."); Milo Community Hosp. v. Weinberger, 525 F.2d 144, 147 (1st Cir.1975) (agency not required to consider environmental factors where "consideration of the factors that the appellant has characterized as 'environmental considerations' could not have changed the Secretary's decision."). Because the I.C.C. has not been granted any discretion under section 1247(d) to base its issuance of an NITU or CITU on environmental consequences, we agree that it would make little sense to force the I.C.C. to consider factors which cannot affect its decision to issue an NITU or CITU.
 
 
 47
 Finally, we must also consider, under Ringsred, whether the I.C.C. exercises sufficient factual control over the conversion such that it constitutes major federal action. See Ringsred, 828 F.2d at 1308. To determine whether such factual control exists, Ringsred outlines several factors:
 
 
 48
 (1) the degree of discretion exercised by the agency over the federal portion of the project; (2) whether the federal government has given any direct financial aid to the project; and (3) whether "the overall federal involvement with the project [is] sufficient to turn essentially private action into federal action."
 
 
 49
 Ringsred, 828 F.2d at 1308 (citing Winnebago Tribe, 621 F.2d at 272). As indicated, the I.C.C.'s role in a conversion proceeding is largely ministerial; the federal government does not in any way fund the conversion; and there is otherwise no federal involvement sufficient to turn what is essentially private, voluntary action into federal action. Especially considering that NEPA seeks only to regulate federal action and not private action, we find no factual control in this case.[9]III. CONCLUSION
 
 
 50
 Because we think that the I.C.C. can exercise little discretion in issuing an NITU or CITU, no purpose can be served by requiring the I.C.C. to conduct an EA as to trail use in an abandonment proceeding. Accordingly, for the reasons stated, the decision of the I.C.C. is affirmed.
 
 
 
 *
 The Honorable Earl R. Larson, Senior United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 Congress enacted the National Trails System Act Amendments of 1983, Pub.L. No. 98-11, tit. II, Sec. 208(2), 97 Stat. 48 (1983) (codified as amended at 16 U.S.C. Sec. 1247(d) (1988)), in response to what one commentator has called the "epidemic" problem of rail abandonments. See Montange, NEPA in an Era of Economic Deregulation: A Case Study of Environmental Avoidance at the Interstate Commerce Commission, 9 Va.Envtl.L.J. 1, 14 (1989). The national rail system has shrunk from at least 270,000 miles of track to 150,000 miles; approximately 3000 miles of track are being abandoned each year. See id. at 14-15 n. 80; Preseault v. Interstate Commerce Comm'n, --- U.S. ----, 110 S.Ct. 914, 918, 108 L.Ed.2d 1 (1990). Because abandonment often results in reversion, Congress has attempted to encourage preservation of track right of way for future use in various ways. In the Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act), Pub.L. No. 94-210, Sec. 809, 90 Stat. 144 (1976) (codified as amended at 49 U.S.C. Sec. 10906 (1988)), for instance, Congress provided that the I.C.C. can impose a public use condition in an abandonment proceeding requiring that the property be offered for sale for public purposes for 180 days. Section 1247(d) goes further in encouraging preservation of rail line. The National Park Service estimates that one-third of existing rights of way are suitable for alternative public use, a percentage which has been characterized as "almost certainly unduly conservative." Montange, supra, at 17 n. 87. Nevertheless, Iowa Southern suggests that prior to implementation of section 1247(d), no more than two percent of abandoned lines were converted to public use. Brief for Intervenor-Respondents at 7. Section 1247(d) seeks to increase that percentage
 
 
 [2]
 The Council on Environmental Quality was established by Congress to oversee implementation of NEPA, and the CEQ's regulations governing much of the environmental review process are binding on federal agencies. Montange, supra note 1, at 4. Its regulations define an environmental assessment as "a concise public document for which a Federal agency is responsible that serves to: (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. Sec. 1508.9(a) (1989). Furthermore, the environmental assessment "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." Id. Sec. 1508.9(b). Thus, an environmental assessment is a brief, agency-compiled document, which assists the agency in its preliminary determination whether to prepare an environmental impact statement. As the regulations put it, an agency shall, "[b]ased on the environmental assessment[,] make its determination whether to prepare an environmental impact statement." Id. Sec. 1501.4(c) (1989). If the agency decides not to prepare an environmental impact statement, it issues a finding of no significant impact. Id. Sec. 1501.4(e), 1508.13
 
 
 [3]
 While the abandonment proceeding was initiated by Iowa Southern, the appeal in this case focuses on the I.C.C.'s disposition of Goos's petition for reconsideration. As such, the I.C.C. is the named respondent, and Iowa Southern appears as an intervenor-respondent. Iowa Southern is joined by Page County Conservation Board, Iowa Natural Heritage Foundation, Southwest Iowa Nature Trails Project, Inc., and Rails to Trails Conservancy. For convenience, we refer to these intervenor-respondents as Iowa Southern
 
 
 [4]
 While Goos in his brief to this court argues the case on precisely these terms, Iowa Southern suggests that the I.C.C. generously interpreted Goos's arguments made in the petition for reconsideration in an attempt "to use this case to declare some new policy excluding railbanking as an option from any consideration under NEPA in rail abandonment proceedings." Brief of Intervenor-Respondents at 13 n. 43. We note only that Iowa Southern does not disagree with the I.C.C.'s position on the threshold applicability of NEPA
 
 
 [5]
 We decide only that Goos has standing to assert environmental injuries in his NEPA challenge to the I.C.C.'s issuance of an NITU. In the wake of Preseault, Goos has abandoned his remaining arguments on appeal, and we express no opinion as to whether Goos's interest in the farm partnership would be sufficient to confer standing to make taking arguments
 
 
 [6]
 The Supreme Court noted in Marsh that while several circuits have applied a "reasonableness standard" of review to this question, the difference between that standard and the arbitrary and capricious standard "is not of great pragmatic consequence," and that "our decision today will not require a substantial reworking of long-established NEPA law." Id. at 1861 n. 23
 
 
 [7]
 One commentator has suggested that while this standard "vests considerable discretion in the Commission to consider a broad variety of factors in the context of an abandonment proceeding," including environmental consequences, the I.C.C. has instead focused only on economic issues, while ignoring environmental ones. Montange, supra note 1, at 14-16. While it may well be that the I.C.C. could place more emphasis on environmental consequences in an abandonment proceeding, this has nothing to do with whether the I.C.C. can exercise any discretion when issuing an NITU or CITU pursuant to section 1247(d). Rather, the argument suggests only that the I.C.C. has been generally unwilling to interest itself in environmental matters
 
 
 [8]
 The I.C.C.'s interpretation of its role under section 1247(d) is consistent with its interpretation that section 1247(d) authorizes only private, voluntary transfers and does not confer on the I.C.C. any power, through condemnation or otherwise, to compel interim trail use. See Preseault, 110 S.Ct. at 924 n. 8 (Supreme court noted that I.C.C. construed section 1247(d) "as not providing federal power to condemn railroad rights-of-way for interim trail use."); National Wildlife Fed'n v. Interstate Commerce Comm'n, 850 F.2d 694, 698-702 (D.C.Cir.1988) (section 1247(d) does not allow I.C.C. to effect mandatory transfers); Connecticut Trust for Historic Preservation v. Interstate Commerce Comm'n, 841 F.2d 479, 482-83 (2d Cir.1988) (same); Washington State Dep't of Game v. Interstate Commerce Comm'n, 829 F.2d 877, 879-81 (9th Cir.1987) (same). The I.C.C. argues that just as it cannot compel a conversion between unwilling parties, neither can it deny one between willing parties because of environmental concerns
 
 
 [9]
 Iowa Southern argues that while the I.C.C. does not have to conduct an EA on the effects of conversion, it should be required to treat conversion as a mitigating alternative in its EA on the abandonment. NEPA requires a description of alternatives under 42 U.S.C. Sec. 4332(2)(E) to proposed federal action even when an EIS is not required. 40 C.F.R. Sec. 1508.9; D. Mandelker, NEPA Law and Litigation Sec. 9:17, at 9-38 (1984). Iowa Southern argues that mention of conversion to trail use in the EA on abandonment is necessary to carry out NEPA's procedural function of fully informing federal agencies and the public so that they may make better decisions. See Montange, supra note 1, at 41-43. To this end, mention of conversion under section 1247(d) would inform rail carriers, local governments and private entities of the option, and give them a timely opportunity to act. The I.C.C. held in its decision, however, that it does not consider trail use to be an alternative to abandonment. Iowa Southern, 5 I.C.C.2d at 504
 The EA prepared in this case, however, did mention trail use as an alternative to abandonment. "Following abandonment and salvage of the rail line, the right-of-way may be suitable for other public use including trail use under 16 U.S.C. 1247(d)." Joint Appendix at 210. Thus, we need not decide whether conversion to trail use is an alternative to abandonment within the meaning of 42 U.S.C. Sec. 4332(2)(E), and therefore whether the I.C.C. must discuss conversion to trail use under section 1247(d) in each case. We note only that we fail to see how treatment of conversion as an alternative subject to 42 U.S.C. Sec. 4332(2)(E) could create for the I.C.C. an "intolerable and unnecessary burden on the agency's limited resources." Brief for Respondent I.C.C. at 34. This hyperbole aside, the applicable regulation would require only a "brief discussion," 40 C.F.R. Sec. 1509.9(b), and could well serve non-federal, local entities by fully informing them of the availability of interim trail use. Moreover, it is to these state and local entities that the I.C.C. looks for review of environmental concerns such as those raised by Goos. We trust that if these entities assume such responsibilities, as we understand they will, the ICC will not attempt to assert any contrary authority via federal pre-emption.